AO 91 (Rev. 11/11)  Criminal Complaint  (modified 3/31/2020)

# UNITED STATES DISTRICT COURT
### for the
Western District of Pennsylvania

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| RAHEEM HURST, A/K/A "MEECH" | ) | 3:23-92 MJ |
| SAMANTHA JONES, A/K/A "SAM" | ) | |
| LEAH JACKSON, A/K/A "SIS" | ) | [UNDER SEAL] |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT
## BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of     September 2022 to March 2023     in the county of     Westmoreland     in the

Western     District of     Pennsylvania     , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to Distribute and to Possess with Intent to Distribute 500 grams or More of a Mixture and Substance Containing a Detectable Amount of Cocaine, a Schedule II Controlled Substance, contrary to the provisions of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(ii). |

This criminal complaint is based on these facts:

See Attached.

☑ Continued on the attached sheet.

/s/ Robert E. Connelly, II

*Complainant's signature*

/s/ Robert E. Connelly, II, HSI Special Agent

*Printed name and title*

Sworn and subscribed before me, by telephone pursuant to Fed. R. Crim. P. 4.1(b)(2)(A).

Date:     03/01/2023

*Judge's signature*

City and state:     Johnstown, Pennsylvania          KEITH A. PESTO, United States Magistrate Judge

*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Mag. No. 23-92 |
| v. | ) | **[UNDER SEAL]** |
| | ) | |
| RAHEEM HURST, A/K/A "MEECH", | ) | |
| SAMANTHA JONES, A/K/A "SAM" | ) | |
| LEAH JACKSON, A/K/A "SIS" | ) | |
| Defendants. | ) | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Robert E. Connelly, II, Special Agent of the Department of Homeland Security – Homeland Security Investigations, being duly sworn, depose and say:

1.      I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.      I have been employed with the Department of Homeland Security – Homeland Security Investigations ("HSI") for the past 21 years. I began my career in November 2001, when I underwent basic law enforcement training at the Federal Law Enforcement Training Center in Glynco, Georgia. Upon graduation from the Academy, I was initially assigned to the Resident Agent in Charge Office (RAC) in Washington D.C. where my work focused on narcotics investigation, child exploitation, and Intellectual Property Rights, in addition to serving as the office's computer forensics agent. I worked in Washington, D.C. until March 2009 when I transferred to my current assignment at the HSI Pittsburgh office. In my current position, among other duties, I serve as a member of the Southwest Pennsylvania Safe Streets Task Force ("SWPSSTF"). The SWPSSTF is an intergovernmental law enforcement task force comprised of federal, state, and local enforcement officers who are specially deputized to serve as federal Task

Force Officers ("TFO") authorized to participate in and conduct investigations into violations of federal law. The SWPSSTF's investigative focus consists of, but is not limited to, violations of the federal Controlled Substances Act, 21 U.S.C. § 801, et seq., violent crime, and criminal gang activity.

3.     In my capacity as a Special Agent with HSI, I have been involved in more than one hundred federal and/or state investigations and have personally arrested or directly assisted in the arrests of drug law violators. I have participated in numerous investigations involving the unlawful distribution and possession with the intent to distribute controlled substances, including cocaine, heroin, fentanyl, crack cocaine, and methamphetamine, in violation of Title 21, United States Code, Sections 841 and 846. These investigations have utilized a variety of investigative techniques such as undercover officers, informants, confidential sources, sources of information, physical surveillance, electronic surveillance, pen registers, telephone toll analysis, and search warrants. I have personally served as the Affiant on search warrants in drug investigations which have led to the discovery evidence related to drug trafficking and led to the successful prosecution of the targets.

4.     Through my involvement in these narcotics investigations, I have handled cooperating sources of information who were involved in narcotics acquisition and/or trafficking. Additionally, I have reviewed thousands of communications between drug traffickers through review of cell phones seized pursuant to drug investigations. I have had hundreds of conversations with drug traffickers, drug users, and other members of law enforcement regarding the methods and language used by drug traffickers to smuggle, store, and distribute drugs and to collect and launder drug distribution proceeds.

5.      I have participated as a monitor and co-case agent in two prior Title III wiretap investigations in the Western District of Pennsylvania.  Each of these cases led to the seizure of controlled substances and successful indictment, arrest, prosecution, and conviction of the wiretap targets.  Through this experience, as well as by way of additional training, I am familiar with the technical aspects of wiretap investigations, including the call monitoring process, transcription of pertinent calls, minimization requirements, and physical surveillance component.  Through my experience conducting drug investigations and my involvement in the two previously cited wiretap investigations, I am familiar with the coded language employed by drug traffickers to disguise the substance of their oral and textual communications.

6.      Based on my training and experience, I am aware that it is common practice for drug traffickers who desire to insulate themselves from detection by law enforcement to routinely utilize multiple telephones, countersurveillance, false or fictitious identities, and coded communications to communicate with their customers, suppliers, couriers, and co-conspirators. Moreover, it is not unusual for drug traffickers to initiate or subscribe such phone services in fictitious names or under the name of an associate or family member to thwart detection by law enforcement.  Also, it is now a common practice for drug traffickers to utilize all communication features of their telephones, most notably the voice call and text message features, nearly simultaneously, to communicate with their conspirators and customers.  For example, it is quite common for a particular transaction to be set up and completed using both voice calls and text messages.  In fact, it is now quite unusual for a drug trafficker to utilize solely one feature of a telephone, such as the voice call feature, to further his criminal activities while not also using another feature, such as the text message feature, to further his criminal activities.

7. Further, based on my training and experience, I know that drug trafficking at the retail level is largely a cash business. I know that drug traffickers often generate large amounts of unexplained wealth, and through financial transactions, attempt to conceal, disguise or legitimize unlawful proceeds through domestic and international banks and their attendant services, casinos, real estate, and business fronts, and otherwise legitimate businesses which generate large quantities of currency. In addition, drug traffickers often use drug proceeds to purchase additional narcotics to perpetuate and promote the ongoing conspiracy. I know that drug traffickers often use cellular telephones to communicate with co-conspirators in furtherance of their money laundering activities.

8. I have personally participated in the instant Title III wiretap investigation of the Organization described herein by serving as co-case agent, along with Special Agent James A. Simpson of the Federal Bureau of Investigation ("FBI").

9. Among my duties as co-case agent in this investigation, I have frequently participated in the daily overhear analysis process, which requires an agent to review intercepted communications and assess their designation as either pertinent or non-pertinent based on their content. Through my participation in this process, I have reviewed a substantial number of the communications that have been intercepted during this investigation. Additionally, during the overhear analysis process, I have reviewed the monitors' summaries/rough transcriptions of intercepted communications for accuracy.

10. I have also managed resource and equipment allocation and deployment, coordinated monitoring and surveillance schedules, supervised the monitoring room, and collaborated on the development of the investigative strategy. As will be explained in greater detail below in this Affidavit, through my review of intercepted wire, electronic, and oral

4

communications, interviews with and/or analysis of reports of interviews submitted by other law enforcement personnel, information gleaned from confidential sources, controlled drug purchases, and other investigative techniques, I am familiar with all aspects of this investigation.

11.     The information in this affidavit is intended to show only that there is sufficient probable cause for the requested complaints and does not set forth all of my knowledge about this matter.

### CONFIDENTIAL SOURCES INFORMATION

12.     As part of the investigation in this case, agents/investigators have received information from seven confidential sources (CS).  This Affidavit includes information provided by one of those sources, CS 6.  Prior to his/her cooperation in this case, CS 6 served previously as a confidential informant with a local police department since 2019 and subsequently for the SWPSSTF.  During his/her cooperation with the local police department and the SWPSSTF, CS 6 provided information that was reliable and credible, and which led to the successful seizure of controlled substances, and the arrest, prosecution, and conviction of multiple individuals for drug trafficking violations.  Between 2011 and 2016, CS 6 has a conviction for Theft and Possession of Drug Paraphernalia.   CS 6 has received $2,550 in cash payments in exchange for CS 6's cooperation throughout the course of this investigation.

13.     Your Affiant submits that the information provided by CS 6, detailed and relied upon for purposes of this Affidavit, is credible and reliable based on the information gathered during the course of the investigation and through its corroboration by law enforcement through interviews with other confidential sources, controlled buys, physical surveillance, and consensually recorded phone calls.

### PROBABLE CAUSE

14.     This Affidavit pertains to three individuals identified during the broader investigation of Robert HURST, a/k/a "Radio," ("R. HURST"), Kevin THOMAS, a/k/a "Kev," Milton PASCHAL, a/k/a "Black," Ernest CLINTON, a/k/a "Hood," **Raheem HURST, a/k/a "Meech,"** ("Ra. HURST"), Keith HURST, a/k/a "Cool," ("K. HURST"), Lonnie MCCANN, a/k/a "Breeze", **Leah JACKSON, a/k/a "Sis,"** and **Samantha JONES, a/k/a "Sam,"** and others known and unknown (hereinafter referred to collectively as the "Organization"[1]).     The investigation has revealed that these members, including **Ra. HURST, JACKSON,** and **JONES** are/have been involved in a conspiracy to distribute quantities of fentanyl, heroin, cocaine, crack cocaine, and other controlled substances throughout the Western District of Pennsylvania, specifically in and around Indiana Borough, Indiana County[2], New Kensington/the City of Arnold/Tarentum, Westmoreland County, and Leechburg, Armstrong County; in the Northern District of Ohio, specifically, in and around the city of Cleveland; to unlawfully possess firearms in furtherance of their drug trafficking activities; and to launder the proceeds from this operation, in violation of Title 21, United States Code, Sections 841(a)(1), 843(b), and 846; Title 18, United States Code, Sections 922, 924, 1956 and 1957.

15.     The investigation in this case began in 2018.  Since that time, over the course of the investigation, agents/officers have received information from seven confidential sources, conducted over 50 controlled buys from different members of the criminal Organization, installed and monitored pen register/trap and trace devices on over 70 telephones, executed search warrants for electronically stored information from over 40 Apple iCloud accounts, issued over 140 grand

---

[1]     Throughout this Affidavit, the term "Organization" will be used to collectively describe the members, facilitators, and/or sources(s) of supply involved or believed to be involved in this ongoing drug trafficking conspiracy.

[2]     As used throughout this Affidavit, "Indiana" refers to Indiana Borough, located in Indiana County, in the Western District of Pennsylvania.

jury subpoenas, conducted hundreds of hours of physical/pole camera surveillance, applied for and received prospective E911/GPS location information for dozens of telephones, among other investigative techniques.

16.     In May 2022, pursuant to a court order, investigators commenced Title III interception of wire and electronic communications occurring over telephones used by several members of the criminal Organization.  Including that first application, since May 2022, investigators have obtained 12 Orders authorizing the Title III interception of wire and electronic communications occurring over a total of 27 telephones, and two Orders authorizing the Title III interception of oral communications and visual non-verbal conduct occurring in one vehicle.  Thus, investigators have conducted Title III interceptions of telephones used by members of this Organization nearly continuously for ten months.

17.     With respect to the three subjects being charged by federal complaint, investigators have intercepted each at various points throughout the periods of Title III interception.  Based on those intercepted communications, your Affiant submits that Ra. HURST, JACKSON, and JONES each serve as a courier, that is one who transport/delivers drugs and/or drug proceeds, and/or a "stash" house operator for the Organization led by R. HURST.

18.     Broadly speaking, Ra. HURST has been intercepted communicating with his father, R. HURST, regarding the distribution of cocaine and/or crack cocaine, or with PASCHAL about resupplying PASCHAL with cocaine.  Likewise, intercepted communications have revealed that JONES and JACKSON have each utilized their respective residences to store quantities of cocaine, crack cocaine, and other suspected narcotics.  Additionally, during intercepted communications, JONES and JACKSON appear to take direction from members of the Organization, such as R.

7

HURST and PASCHAL, regarding resupplying members of the Organization, such as K. HURST, PASCHAL, and others known to investigators.

19.     Below are examples of some of the intercepted communications involving Ra. HURST, JACKSON, and JONES which your Affiant submits establishes probable cause to believe that each Defendant has conspired to distribute and to possess with intent to distribute 500 grams or more of cocaine.

### i.  Intercepted Communications Involving Ra. HURST

20.     Investigators initiated Title III interception of wire communications occurring over R. HURST's (216) 355-3413 ("TT 21") on January 3, 2023.  During the second audio interception on TT 21, at approximately 10:09 a.m. EST on January 3, 2023, your Affiant, who is familiar with R. HURST's voice from prior court-authorized intercepted calls (such as calls intercepted over coconspirator Kevin THOMAS's (856) 270-3852 ("TT 38")), identified the male speaker using and possessing TT 21 as R. HURST.

21.     On January 12, 2023, at 5:16 p.m., R. HURST, via TT 21, received an incoming

call from Ra. HURST via (216) 434-8959[3] (hereinafter "RH 8959").  The call is summarized in

pertinent part below:

> …
> RH 8959:     Nothin', what you doin'?
> TT 21:       I ain't doing nothing. I'm about to be on my way to the jungle.
> RH 8959:     Oh yeah, I was about to ask you that. You still here?
> TT 21:       I'm about to stop at Dirty's house, then about to leave.
> RH 8959:     Okay, a'right well I was trying to grab me some more smoke! But I got
>              seven hunnit (700) now, and take that seven hunnit (700) for me, but my
>              people want fourteen (14), so I was trying to get seven hundred (700) from
>              you, and you can go get it back from Tay.
> TT 21:       Oh yeah... I ain't, I ain't got no money on me... you know I don't come
>              outside with no money to go the jungle.

---

3       According to records administratively subpoenaed from T-Mobile, (216) 434-8959 has no listed subscriber information.  Telephone number (216) 434-8959 was activated on June 9, 2022, and investigators believe service to the telephone has been terminated.  Your Affiant attributes use and possession of (216) 434-8959, (216) 632-0279, and (216) 527-6414 to Raheem HURST based on the following: (1) on January 15, 2023, investigators intercepted an incoming MMS message from R. HURST's TT 21 of a utility bill for 415 Lowell Lane, Vandergrift, PA in the name of "Raheem Hurst" to THOMAS's TT 38; (2) calls between R. HURST via TT 21 and Ra. HURST via (216) 434-8959 indicate a father/son relationship; (3) during a ruse call on February 8, 2023 placed to (216) 434-8959, the male user of (216) 434-8959 identified himself as "Raheem", which matches the first name that appears on Ra. HURST's Ohio driver's license; (4) as described below, Ra. HURST via (216) 527-6414 contacted R. HURST via TT 21 and described the "ruse" call in which he identified himself as "Raheem"; (5) CS 6 identified Ra. HURST as "Meech" the son of R. HURST and a courier of cash and resupplies of cocaine to the New Kensington areas; (6) CS 6 further explained that Ra. HURST distributes cocaine and crack cocaine in the New Kensington area; (7) On December 16, 2022, Ra. HURST via (216) 527-6414 identified himself in a text message to PASCHAL via TT 28 as "Heem", which is short for Ra. HURST's first name as it appears on his Ohio driver's license; (8) based on a voice comparison and similar topics of conversation on the respective telephones (216) 434-8959, (216) 632-0279, and (216) 527-6414; (9) on December 19, 2022, PASCHAL via TT 28 made an outgoing call to Ra. HURST via (216) 527-6414, in which Ra. HURST identified his vehicle as a Kia Soul and investigators confirmed that Ra. HURST has a Kia Soul registered to him ("That nigga in the same car as me too, that's what's so crazy. In a mothafucking Kia Soul"); (10) a Department of Motor Vehicles check for Ra. HURST yielded one registered vehicle to him a 2015 Kia Soul bearing Ohio registration JXX9045 with a listed address of "13608 Oakview Boulevard, Garfield Heights, OH 44125", which the address matches Ra. HURST's Ohio driver's license; and (11) on February 9, 2023, R. HURST via TT 21 received an incoming call from Ra. HURST via (216) 632-0279 indicating he had replaced his previous phone (216) 434-8959.

9

| RH 8959: | I figured that... I was trying to catch you before you was leaving. I knew it too. |
|---|---|
| TT 21: | Oh yeah, you know I ain't got no money on me, bro. |
| RH 8959: | I know. |

…

22.     Based on your Affiant's training, experience, knowledge of the investigation, and plain language used by R. HURST and Ra. HURST, I believe that during this intercepted call, R. HURST stated that he was going to pick up some items from a residence before leaving ("Nah, I'm about to grab my stuff at Dirty's house, then about to leave").  However, Ra. HURST informed R. HURST that he needed resupplied with crack cocaine ("Okay, a'right well I was trying to grab me some more smoke").  Ra. HURST advised that he did not want to purchase the crack cocaine with the $700 he had available to him ("But I got seven hunnit (700) now and take that seven hunnit (700) for me").  Ra. HURST continued that his customers wanted 14 grams of crack cocaine ("but my people want fourteen (14)").  Subsequently, Ra. HURST asked for $700 from R. HURST on behalf of another person whom R. HURST knew owed Ra. HURST money in order to purchase the 14 grams of crack cocaine ("so I was trying to get seven hundred (700) from you to get it back from Tay").  R. HURST explained he does not like to have bulk cash on his person ("Oh yeah... I ain't, I ain't got no money on me... you know I don't come outside with no money to go throw down [U/I] to go the jungle").  Ping location data for R. HURST's TT 21 showed the "device" near Harvard Avenue East and East 131st Street, in the Cleveland area.  Your Affiant believes that Ra. HURST wanted $700 from R. HURST on behalf of that person works as a redistributor under R. HURST, and thus R. HURST would be responsible for his drug debt.

23.     Similarly, on January 17, 2023, at 6:33 p.m., R. HURST, via TT 21, received an incoming call from Ra. HURST via (216) 434-8959 (hereinafter "RH 8959").  The call is summarized in pertinent part below:

| | |
|---|---|
| … | |
| TT 21: | Yeah.... what you trying to do? |
| RH 8959: | Uh... same thing. |
| TT 21: | What's that, dude? |
| RH 8959: | Uh, I got, uh... seven (7) hun-... Nah, I got eight hunnit (800) and then, I'll have some money when I get paid. |
| … | |
| RH 8959: | Mommy said if you make a twenty (20) for RJ. |
| TT 21: | Yeah. |
| … | |
| TT 21: | [BACKGROUND: UM: I'mma have... uh, huh?] [ASIDE: What you want for a half?] [BACKGROUND: UM: Which (U/I)?] |
| … | |
| RH 8959: | She said, she said, um, be here about two thirty (2:30). |
| TT 21: | Alright. Come... Uh, he's... he got a half (1/2) for you. Come over here. Come over, uh... [BACKGROUND: UM: I'm, I'm going to the back.] Yeah, come to the back, come to the back. |
| RH 8959: | A'ight. |
| … | |

24.     Based on your Affiant's training, experience, knowledge of the investigation, and plain language used by R. HURST and Ra. HURST, I believe that during this intercepted call, R. HURST asked Ra. HURST how much crack cocaine he needed ("Yeah….what you trying to do"). Ra. HURST advised he wanted the same amount he obtained during a previous transaction ("Uh…same thing"). R. HURST requested clarification of the amount ("What's that, dude"). Ra. HURST advised he had $800 for the purchase of crack cocaine ("I got eight hunnit (800)"). Ra. HURST advised that R. HURST's mother asked him to request that R. HURST provide a 0.2-gram portion of crack cocaine for another customer ("Mommy said if you make a twenty (20) for RJ"). R. HURST agreed ("Yeah"). R. HURST could then be heard asking a distributor what price he wanted for a half-ounce of an unspecified substance ("What you want for a half"). Ra. HURST informed R. HURST that he needed to be at his location about 2:30 p.m. ("She said, she said, um, be here about two thirty (2:30)") to which R. HURST acknowledged ("Alright"). R. HURST advised he would have the half-ounce of crack cocaine for Ra. HURST ("he got a half (1/2) for

you") but that Ra. HURST needed to come to R. HURST's location ("Come over here"). Ra. HURST affirmed ("A'ight"). Ping location data for R. HURST's TT 21 showed the device in the Cleveland area at the time of this call. Your Affiant believes R. HURST coordinated for a third-party to distribute 14 grams of crack cocaine to Ra. HURST for $800.

25. Investigators initiated Title III interception of wire and electronic communications occurring over Milton PASCHAL's (724) 591-1870 ("TT 28") on November 29, 2022. During the first audio interception on TT 28, at approximately 8:15 a.m. EST on November 29, 2022, your Affiant, who is familiar with PASCHAL's voice from prior court-authorized intercepted calls (such as calls intercepted over CLINTON's TT 15), identified the male speaker using and possessing TT 28 as PASCHAL.

26. On February 8, 2023, at 11:22 a.m., PASCHAL, via TT 28 received an incoming call from Lonnie MCCANN via (724) 701-1363 (hereinafter "LM 1363"). The call is summarized in pertinent part below:

> …
> LM 1363:    All cut up or solid.
> TT 28:    Are you coming down?
> LM 1363:    Huh? Yeah, I'mma pull up on yo- on your, waiting for my little chick to come serve me. [U/I].
> TT 28:    What time that is?
> LM 1363:    She should be here in like forty-five (:45).
> TT 28:    Alright.
> …
> LM 1363:    I hope you give me like an hour- an hour and a half (1:30), give me like an hour (1:00).
> TT 28:    Okay.
> …

27. Based on your Affiant's training, experience, knowledge of the investigation, and plain language used by PASCHAL and MCCANN, I believe that during this intercepted call, MCCANN asked PASCHAL to provide him a quantity of cocaine or crack cocaine ("All cut up

or solid"). PASCHAL asked if MCCANN would be meeting him at 464 East 7th Avenue, Apartment 6, Tarentum, PA ("Are you coming down"). MCCANN confirmed ("Yeah, I'mma pull up on yo- on your") but explained he had to wait to meet with a female first ("waiting for my little chick to come serve me"). MCCANN estimated the female would be at his location in around 45 minutes ("She should be here in like forty-five (:45)"). MCCANN estimated that he would arrive at PASCHAL's residence in 60-90 minutes ("give me like an hour- an hour and a half (1:30), give me like an hour (1:00)"). PASCHAL agreed ("Okay").

28. On February 8, 2023, at 1:07 p.m., PASCHAL, via TT 28 received an incoming call from Lonnie MCCANN via (724) 701-1363. The call is summarized in pertinent part below:

| | |
|---|---|
| TT 28: | Hello. |
| LM 1363: | Nigga I'm at the front door. |
| TT 28: | Alright, here I come, I'm about to pull up. |

29. Based on your Affiant's training, experience, knowledge of the investigation, and plain language used by PASCHAL and MCCANN, I believe that during this intercepted call, MCCANN informed PASCHAL he was at 464 East 7th Avenue, Apartment 6 ("I'm at the front door") to which PASCHAL explained he would be there momentarily ("here I come, I'm about to pull up"). Ping location data for PASCHAL's TT 28 reported the device in the vicinity of 464 East 7th Avenue, Apartment 6 at the time of this call. Additionally, since the initial interception of MCCANN on December 2, 2022, through a combination of ping location data, pole camera, and wire and electronic intercepts, investigators have identified several occasions during which MCCANN has met with PASCHAL at 464 East 7th Avenue, Apartment 6, to resupply with an ounce quantity of crack cocaine and seven grams of cocaine. Therefore, your Affiant believes that, consistent with this regular practice, MCCANN met with PASCHAL at 464 East 7th Avenue, Apartment 6, and obtained an ounce of crack cocaine and seven grams of cocaine.

30.     On February 8, 2023, at 2:36 p.m., PASCHAL, via TT 28, received an incoming call from Ra. HURST via (216) 527-6414.  The call is summarized in pertinent part below:

> …
> RH 6414:     I'm outside.
> TT 28:          What you say?
> RH 6414:     Huh?
> TT 28:          Front door.
> RH 6414:     You said the front?
> TT 28:          Yeah.
> RH 6414:     Okay.

31.     Based on your Affiant's training, experience, knowledge of the investigation, and plain language used by PASCHAL and Ra. HURST, I believe that during this intercepted call, Ra. HURST informed PASCHAL he was at 464 East 7th Avenue, Apartment 6, ("I'm outside") to which PASCHAL directed Ra. HURST to meet him at the front of 464 East 7th Avenue, Apartment 6 ("Front door").  Ra. HURST agreed ("Okay").

32.     On February 8, 2023, at 2:38 p.m., PASCHAL, via TT 28, received an incoming call from Ra. HURST via (216) 527-6414.  The call is summarized in pertinent part below:

> TT 28:          What's up?
> RH 6414:     I gotta run and go see Cool real quick.
> TT 28:          Mh-hm.
> RH 6414:     Okay.

33.     Based on your Affiant's training, experience, knowledge of the investigation, and plain language used by PASCHAL and Ra. HURST, I believe that during this intercepted call, Ra. HURST explained he had to drop off a resupply of cocaine to K. HURST first at his residence before meeting with PASCHAL ("I gotta run and go see Cool real quick").   PASCHAL acknowledged ("Mh-hm").  Ping location data for PASCHAL's TT 28 reported the device to be in the vicinity of 464 East 7th Avenue, Apartment 6, at the time of this call.  Additionally, from 2:32 p.m. to 2:42 p.m., a review of the pole camera on 464 East 7th Avenue, Apartment 6, showed

a Kia Soul, consistent with one that investigators know Ra. HURST to drive, travel past the side door of the apartment complex that houses Apartment 6 and park nearby. The pole camera's view of the parking location of the Kia Soul was obstructed however, which prevented investigators from observing the actions of the driver of the Kia Soul. Nevertheless, your Affiant believes that Ra. HURST had arrived at Apartment 6 to drop off a resupply of cocaine with PASCHAL, but instead proceeded to meet with K. HURST to drop off another resupply of cocaine first.

34.     On February 8, 2023, at 4:40 p.m., PASCHAL, via TT 28, received an incoming call from Ra. HURST via (216) 527-6414. The call is summarized in pertinent part below:

RH 6414:     I'm outside.

35.     Based on your Affiant's training, experience, knowledge of the investigation, and plain language used by PASCHAL and Ra. HURST, I believe that during this intercepted call, Ra. HURST explained he was at PASCHAL's residence 464 East 7th Avenue, Apartment 6, ("I'm outside"). Ping location data for PASCHAL's TT 28 reported the device in the vicinity of 464 East 7th Avenue, Apartment 6, at the time of this call. Furthermore, at 5:42 p.m., investigators conducting spot surveillance observed Ra. HURST's Kia Soul parked at PASCHAL's residence out of view from the pole camera. Ping location data for PASCHAL's TT 28 reported the device to be in the vicinity of 464 East 7th Avenue, Apartment 6, at the time of the observation of the Kia Soul.

36.     On February 8, 2023, at 5:23 p.m., PASCHAL, via TT 28, made an outgoing call to an Unknown Male via (724) 826-0760 (hereinafter "UM 0760"). The call is summarized in pertinent part below:

...
TT 28:       When my peoples get here, I'mma pull up on you.
UM 0760:     Alright, I'm upstairs.
TT 28:       Alright.

37.     Based on your Affiant's training, experience, knowledge of the investigation, and plain language used by PASCHAL and UM 0760, I believe that during this intercepted call, PASCHAL explained to UM 0760 that he was waiting on his supplier to arrive and that he would meet up with UM 0760 to drop off a quantity of crack cocaine to him once his supplier got there ("When my peoples get here I'mma pull up on you").   UM 0760 affirmed ("Alright"). Investigators have intercepted numerous other calls between UM 0760 and PASCHAL in which the two have discussed money drop-offs and narcotics distribution.   Ping location data for PASCHAL's TT 28 reported the device to be in the vicinity of 464 East 7th Avenue, Apartment 6, at the time of this call.   Your Affiant believes that Ra. HURST is a courier for his father, R. HURST, who regularly brings resupplies of cocaine to members of the Organization to include PASCHAL, CLINTON, and K. HURST.  Similarly, as evidenced in the calls set forth above, your Affiant believes that Ra. HURST resupplied PASCHAL and K. HURST with cocaine. Additionally, your Affiant believes that PASCHAL delayed bringing UM 0760 until Ra. HURST resupplied him.

### ii. Intercepted Communications Involving JACKSON

38.     Investigators only recently identified JACKSON and discovered her role as a courier and "stash" house operator for the Organization who facilitates the resupply of members of the Organization such as PASCHAL, K. HURST, CLINTON, and others known and unknown. During the investigation, there have been numerous intercepted calls between JACKSON, via (757) 604-5279, and PASCHAL, via TT 28.  Through analysis of those calls from November 29, 2022 to the present, investigators identified approximately 22 occasions on which JACKSON resupplied PASCHAL, which resupplies totaled over 1,000 grams of cocaine.  During these calls,

PASCHAL typically ordered ounces of cocaine from JACKSON and JACKSON would deliver the cocaine directly to PASCHAL's residence at 464 East 7th Avenue, Apartment 6.

39.     For example, on January 28, 2023, at 4:33 p.m., PASCHAL via TT 28, made an outgoing call to JACKSON via (757) 604-5279[4] (hereinafter "LJ 5279").  The call is summarized in pertinent parts below:

…
| | |
|---|---|
| TT 28: | Throw me one (1) over here says twenty (20)- grams. |
| LJ 5279: | You said what? |
| TT 28: | The one (1) you bought me with all them bags wrapped around it, that shit say "twenty-three (23) grams". [BRIEF PAUSE] gotta break [U/I] grams. |
| LJ 5279: | The one (1) from yesterday? |
| TT 28: | You had-. Whichever one (1) has the three (3) things wrapped around it that you had... I ain't put it up I. |
| LJ 5279: | You said there was something wrapped around it? |
| TT 28: | Bags wrapped around it. |
| LJ 5279: | I can barely hear you, hold on. Say that one more time. |
| TT 28: | It was like... it was like three (3) bags wrapped around it. It say "twenty-three seven (23-7)" right now. Wait... twenty (20) uh... twenty-four seven (24-7) with the bags, so that mean... oh okay. |
| LJ 5279: | Oh, that not... that must be... that... that was from him 'cause I... that wasn't from me. Alright. |
| TT 28: | Alright. |
| LJ 5279: | Alright. |

…

4       According to records administratively subpoenaed from AT&T, (757) 604-5279 has a listed subscriber "Leah Jackson" at "12 Haser Drive, New Kensington, PA 15068". Telephone number (757) 604-5279 was activated on April 10, 2019, and is currently active.  Your Affiant attributes use and possession of (757) 604-5279 to Leah JACKSON based on the following: (1) open source data base checks for phone number (757) 604-5279 list JACKSON as the user; (2) the subscriber name of telephone number (757) 604-5279 matches JACKSON's driver's license; (3) a search of phone number (757) 604-5279 in CashApp resolves to a "$LeahMJackson" with a user "Leah Jackson" and a photo that matches her Pennsylvania driver's license; (4) on February 17, 2023, at 9:30 a.m., THOMAS via TT 38 received an incoming call from K. HURST via (724) 393-1529 references JACKSON by her first name delivering a quantity of cocaine to him at his residence ("Leah [PH] ain't come through here, I... we'd been alright"); and (5) the Hyundai Sonata registered to JACKSON has been observed at key location to include THOMAS and R. HURST's main "stash" house 415 Lowell Street, Vandergrift, PA.

40.     Based on your Affiant's training, experience, knowledge of the investigation, and plain language used by PASCHAL and JACKSON, I believe during this intercepted call, PASCHAL advised JACKSON that a quantity of cocaine she had delivered to him was short ("Throw me one (1) over here says twenty (20)- grams").   PASCHAL stated that the bag JACKSON had provided him only weighed 23 grams ("The one (1) you bought me with all them bags wrapped around it, that shit say "twenty-three (23) grams"").  JACKSON asked if PASCHAL was referring to the cocaine she had brought him the day before ("The one (1) from yesterday"). PASCHAL corrected himself and stated that the cocaine and packaging weighed 24.7 grams ("Wait... twenty (20) uh... twenty-four seven (24-7) with the bags, so that mean... oh okay"). JACKSON told PASCHAL that the cocaine he was referring to must have come from someone else, possibly referring to cocaine provided by Ra. HURST ("Oh, that not... that must be... that... that was from him").

41.     In another example, on February 1, 2023, at 5:32 p.m., PASCHAL via TT 28, made an outgoing call to JACKSON via (757) 604-5279. The call is summarized in pertinent parts below:

> …
> TT 28:        Yeah, bring me two (2) of them.
> LJ 5279:      I just left the house. Alright, I'll go back.

42.     Based on your Affiant's training, experience, knowledge of the investigation, and plain language used by PASCHAL and JACKSON, I believe during this intercepted call, PASCHAL requested that JACKSON bring him two ounces of cocaine ("bring me two (2) of them") to which JACKSON explained she had departed her residence ("I just left the house"). JACKSON agreed to go back to her residence to obtain the two ounces of cocaine for PASCHAL ("Alright, I'll go back").

43. Another example, on February 1, 2023, at 5:45 p.m., PASCHAL via TT 28, made an outgoing call to JACKSON via (757) 604-5279. The call is summarized in pertinent parts below:

…
| | |
|---|---|
| TT 28: | Come through the front door, 'cause I'mma leave it unlocked. It's cold as fuck. |
| LJ 5279: | Like where the parking lot is at? |
| TT 28: | Yeah. |
| LJ 5279: | Alright. |
…

44. Based on your Affiant's training, experience, knowledge of the investigation, and plain language used by PASCHAL and JACKSON, I believe during this intercepted call, PASCHAL directed JACKSON to come in the main entrance to 464 East 7th Avenue, Apartment 6 ("Come through the front door") to which JACKSON agreed ("Alright"). Ping location data for PASCHAL's TT 28 showed the device to be at 464 East 7th Avenue, Apartment 6 at the time of this call. Thus, your Affiant believes that JACKSON obtained two ounces of cocaine from her residence at 508 Catalpa Street, New Kensington, PA and delivered the cocaine to PASCHAL at 464 East 7th Avenue, Apartment 6.

### iii. Intercepted Communications Involving JONES

45. Like JACKSON, based on the totality of the investigation, including based on intercepted communications and surveillance, your Affiant believes that JONES, utilizes her residence located at 1607 4th Avenue, Apartment 2, Arnold, PA, to store and distribute narcotics on behalf of members of the Organization.

46. For example, on January 24, 2023, at 6:13 p.m., R. HURST via TT 21, made an outgoing call to Samantha JONES via (724) 980-6031[5] (hereinafter "SJ 6031"). The call is summarized in pertinent parts below:

| | |
|---|---|
| SJ 6031: | Hello? |
| TT 21: | Hey uh... Yeah, I'mma have her just bring it over there around like eight-thirty (8:30). You gon' be at your house? |
| SJ 6031: | Yeah, just watching T.V. |
| TT 21: | Okay, I, uh... I'll text you when she 'bout to pull up. |
| SJ 6031: | Alright, thanks. |
| TT 21: | Alright, thank you. |

47. Based on your Affiant's training, experience, knowledge of the investigation, and plain language used by R. HURST and JONES, I believe that during this intercepted call, R. HURST advised JONES that he would be sending a female to JONES's to drop off a quantity of cocaine ("I'mma have her just bring it over there around like eight- thirty (8:30)"). R. HURST asked if JONES would be at her residence ("You gon' be at your house") and JONES confirmed that she would ("Yeah, just watching T.V."). R. HURST advised that he would contact JONES when the female was near her residence ("I'll text you when she 'bout to pull up"). JONES acknowledged ("Alright"). Ping location data for R. HURST's TT 21 showed the device to be in the Cleveland area at the time of this call. Additionally, your Affiant believes that the female R.

_____

5      According to records administratively subpoenaed from AT&T, (724) 980-6031 has a listed subscriber "Samantha Jones" at "1604 4th Avenue, New Kensington, PA 15068". Telephone number (724) 980-6031 was activated on June 13, 2022, and is currently active. Your Affiant attributes use and possession of (724) 980-6031 to Samantha JONES based on the following: (1) open source data base checks for phone number (724) 980-6031 list JONES as the user; (2) the subscriber name of telephone number (724) 980-6031 matches JONES's driver's license; (3) on February 19, 2023, at 5:06 p.m., PASCHAL via TT 28 made an outgoing call to JONES via (724) 980-6031 and called JONES by her first name ("Hey, Sam"); (4) the white GMC bearing Pennsylvania registration GWY0459 had a listed owner "Samantha Jones", which matches JONES's name on her Pennsylvania driver's license; (5) following a call with PASCHAL on February 22, 2023, TFO's positively identified JONES by her Pennsylvania driver's license as described below; and (6) the Water Authority provided JONES paid utilities at 1607 4th Avenue, Arnold, PA.

HURST was directing to deliver the cocaine to JONES was JACKSON. Thus, your Affiant believes that R. HURST had JACKSON bringing over a quantity of cocaine to be stored and subsequently distributed from JONES's residence at 1607 4th Avenue, Apartment 2, Arnold, PA.

48.    On February 16, 2023, at 5:20 p.m., PASCHAL via TT 28, made an outgoing call to JACKSON via (757) 604-5279. The call is summarized in pertinent parts below:

> …
> TT 28:        Can you stop at Sam house for me?
> LJ 5279:      And do what?
> TT 28:        I just need - I just need you to grab one (1) of them things for me. I just ain't tryna go back over to that motherfuckin... All them police is on Freeport.
> …
> LJ 5279:      Whatchu say?
> TT 28:        I need you to grab one (1) of them things from Sam for me.
> …
> LJ 5279:      A'right.
> …

49.    Based on your Affiant's training, experience, knowledge of the investigation, and plain language used by PASCHAL and JACKSON, I believe during this intercepted call, PASCHAL directed JACKSON to go to JONES's residence 1607 4th Avenue, Apartment 2 ("Can you stop at Sam house for me"). JACKSON asked for specifics on what PASCHAL needed her to do ("And do what"). PASCHAL instructed JACKSON to pick up an ounce cocaine for him from JONES's residence ("I just need you to grab one (1) of them things for me"). PASCHAL stated he was worried about law enforcement in the area ("All them police is on Freeport"). JACKSON asked for PASCHAL to repeat his instructions ("Whatchu say") to which PASCHAL again directed JACKSON to pick up an ounce of cocaine from JONES's residence 1607 4th Avenue, Apartment 2 ("I need you to grab one (1) of them things from Sam for me"). JACKSON agreed ("A'right").

50.     On February 19, 2023, at 5:06 p.m., PASCHAL via TT 28, made an outgoing call

to JONES via (724) 980-6031. The call is summarized in pertinent parts below:

```
…
TT 28:          Hey, Sam.
SJ 6031:        What's up?
TT 28:          Uh... I'm 'bout to send Rich over there. Can you just give him two (2) of
                them? I'ma bring you the money before you go to sleep, alright?
SJ 6031:        Yeah, sure.
TT 28:          He's about to come over. Just get- put two (2) of them in like the bag or
                somethin' like that...
SJ 6031:        A'right.
TT 28:          Call me when you um- I just called him befo- he's just gonna come over
                there, so...
SJ 6031:        A'right.
TT 28:          'Kay.
```

51.     Based on your Affiant's training, experience, knowledge of the investigation, and

plain language used by PASCHAL and JONES, I believe during this intercepted call, PASCHAL

called JONES by her abbreviated first name ("Hey, Sam") and informed JONES that a customer

was going to be coming to her residence ("I'm 'bout to send Rich over there").  PASCHAL directed

JONES to provide "Rich" two ounces of cocaine ("Can you just give him two (2) of them").

PASCHAL stated that he would provide JONES money later in the evening for assisting him with

the distribution of cocaine ("I'ma bring you the money before you go to sleep, alright").  JONES

agreed ("Yeah, sure").  PASCHAL advised JONES that the the customer was close ("He's about

to come over") and to prepare the two ounces of cocaine for distribution ("Just get- put two (2) of

them in like the bag or somethin' like that").  JONES acknowledged ("A'right").  PASCHAL again

informed JONES the customer would be at her residence soon ("I just called him befo- he's just

gonna come over there").

52.     On February 19, 2023, at 5:15 p.m., PASCHAL via TT 28, received an incoming

call from JONES via (724) 980-6031.  The call is summarized in pertinent parts below:

…
SJ 6031:       Uh... yeah, Rich was just here so he should be on his way.
TT 28:         A'right.
...

53.     Based on your Affiant's training, experience, knowledge of the investigation, and plain language used by PASCHAL and JONES, I believe during this intercepted call, JONES advised she provided the two ounces of cocaine to the customer ("Rich was just here so he should be on his way"). PASCHAL acknowledged ("A'right"). Your Affiant believes that PASCHAL directed a customer to JONES's residence and that JONES provided the customer two ounces of cocaine from 1607 4th Avenue, Apartment 2.

### iv. Drug Quantities Attributable to Ra. HURST, JACKSON, and JONES

54.     Based on the totality of the investigation, including through intercepted calls, surveillance (physical and pole camera), and other investigative methods, your Affiant believes that, based on Ra. HURST's, JACKSON's, and JONES's own conduct, and that of coconspirators' reasonably foreseeable to them, that:

- Ra. HURST is responsible for 556.2 grams of cocaine;

- JACKSON is responsible for 1,189 grams of cocaine; and

- JONES is responsible for over 2,000 grams of cocaine.

### CONCLUSION

55.     Based upon the foregoing, I submit that this affidavit supports probable cause that **Raheem HURST**, **Leah JACKSON**, and **Samantha JONES** have engaged in violations of Title 21, United States Code, Section 846, in the Western District of Pennsylvania and elsewhere. Specifically, I submit that this Affidavit establishes probable cause to believe that, between September 2022 and March 2023, in the Western District of Pennsylvania and elsewhere, **Raheem**

**HURST, Leah JACKSON,** and **Samantha JONES** have conspired with one another and with persons both known and unknown to investigators, to distribute and to posses with intent to distribute 500 grams or more of cocaine, a Schedule II controlled substance, contrary to the provisions of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(ii), in violation of Title 21, United States Code, Section 846.

/s/ *Robert E. Connelly, II*
Robert E. Connelly, II, Special Agent
Department of Homeland Security
Homeland Security Investigations

Sworn and subscribed before me, by telephone
pursuant to Fed. R. Crim. P. 41(b)(2)(A),
This 1st day of March, 2023.

HONORABLE KEITH A. PESTO
UNITED STATES MAGISTRATE JUDGE